UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GULF COAST COMMERCIAL CORPORATION,

                Plaintiff,

vs.                         Case No.  2:05-cv-564-FtM-33SPC

GORDON RIVER HOTEL ASSOCIATES;
TIMOTHY G. YOUNGQUIST; HARVEY B.
YOUNGQUIST; COMFORT INN & MARINA
DOWNTOWN; VARIOUS JOHN DOES; VARIOUS
JANE DOES; ABC COMPANIES,

                Defendants.

_____

**ORDER**

    This matter comes before the Court on Plaintiff Gulf Coast Commercial Corporation's Motion for Entry of Preliminary Injunction (Doc. # 11), filed on February 9, 2006.  Defendants filed their Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Incorporated Memorandum of Law (Doc. # 45) on March 10, 2006.  On April 4, 2006, the Court held a hearing on the Motion for Preliminary Injunction.  Plaintiffs filed a Request for Judicial Notice and Third Notice of Supplemental Authority (Doc. # 76) on April 19, 2006, notifying the Court that its application for registration had been approved by the Patent and Trademark Office.  On April 21, 2006, the Court provided Defendants with the opportunity to respond to Plaintiff's notice.  Defendants' Response to Plaintiff's Request for Judicial Notice (Doc. # 82) was filed on May 5, 2006.

In addition to these filings, Defendants filed a Motion to Strike Declarations (Doc. # 46) on March 10, 2006.  Plaintiff responded in opposition to the Motion to Strike (Doc. # 54) on March 27, 2006.  Both the Motion for Entry of Preliminary Injunction and the Motion to Strike are now ripe for review.  For the reasons stated herein, the Motion to Strike is **GRANTED IN PART, DENIED IN PART** and the Motion for Entry of Preliminary Injunction is **DENIED**.

**I.  BACKGROUND**

This case involves a dispute between two companies that own hotels on Fifth Avenue in Naples, Florida.  Gulf Coast Commercial Corporation owns The Inn on Fifth.  Gordon River Hotel Associates owns the Bayfront Inn on Fifth.  The crux of their dispute is whether Inn on Fifth is a valid, protectable trademark that is infringed upon by Gordon River's use of the Bayfront Inn on Fifth mark.

Gulf Coast began using Inn on Fifth as its mark in January of 1997.  (Doc. # 12, p. 3.)  It has spent large sums of money— in excess of one million dollars— advertising and promoting The Inn on Fifth as a luxury boutique hotel.  (Doc. # 12, p. 3; Doc. # 14, p. 2.)  The Bayfront Inn on Fifth is a former Comfort Inn that Defendants began operating under the mark The Bayfront Inn on Fifth around December 2005 or January 2006.  (Doc. # 12, p. 4.)

The dispute began when Gulf Coast learned that Gordon River planned to use the words Inn on Fifth in the name of its hotel.  On November 1, 2005, Gulf Coast sent Gordon River a letter requesting that Gordon River not adopt or use the words Inn on Fifth in its hotel's new name.  (Doc. # 12, p. 2.)  Gordon River did not respond to the letter, nor did it respond to a subsequent letter from Gulf Coast to the same effect.  (Doc. # 12, p. 2.)  Before Gordon River began using the mark, Gulf Coast filed its Complaint on November 29, 2005.

Gulf Coast's trademark application has been approved by the PTO and is set to be published in the Official Gazette.  (Doc. # 76, p. 2.)  After publishing the mark in the Official Gazette, any party who believes it may be damaged by registration of the mark has thirty days to file an opposition to registration.  Only if there are no successful oppositions to the mark's registration does the mark enter the next stage of the registration process.  At this stage in the proceedings, Gulf Coast's mark has yet to mature into a registered trademark.  Thus, Gulf Coast retains the burden of persuading the Court that it held a valid, protectable trademark.

## II. MOTION TO STRIKE

In their Motion to Strike Declarations (Doc. # 46), Defendants ask the Court to strike the declarations of Jeffrey Samuels (Doc. # 13), Philip McCabe (Doc. # 14), Damon Delp (Doc. # 19), Robert

Bentley (Doc. # 18), Cathy Christopher (Doc. # 16), and Sharon Safko (Doc. # 15). Defendants also request that other subsequent declarations be stricken because the method by which Plaintiff filed its declarations deprived Defendants of the opportunity to respond and defend. For the reasons stated herein, the Motion to Strike is **GRANTED IN PART, DENIED IN PART.**

Rule 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). To the extent that Defendants' motion requests that the Court strike the affidavits of Jeffrey Samuels, Philip McCabe, Damon Delp, Robert Bentley, Cathy Christopher, and Sharon Safko, the motion is denied. In denying this portion of the Motion to Strike, the Court notes that it may consider otherwise inadmissible evidence at the preliminary injunction stage. See Sierra Club v. Fed. Deposit Ins. Corp., 992 F.2d 545 (5th Cir. 1993)(stating that "at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."); see also Clark v. Merrill Lynch, 1995 U.S. Dist. LEXIS 11541, at *9 (M.D. Fla. Jun. 15, 1995)(finding that where plaintiff moved to strike an affidavit on the basis that it contained multiple hearsay, "[t]he court finds plaintiff's argument goes to the weight and not the admissibility of the evidence.").

Much of the material Defendants moved to strike has either been disregarded or given minimal weight in the Court's determination whether to issue a preliminary injunction in this case.  For example, to the extent that the Samuels affidavit reads as an explanation of the applicable law of the case, restates material already before the Court, or instructs the Court on the law, it has been disregarded because it is not helpful to the trier of fact.  See Fed. R. Evid. 702.

Likewise, to the extent that the Court finds certain statements made in the McCabe affidavit to lack credibility because of their self-serving, self-interested, or conclusory nature, the Court has accorded those statements minimal weight.  Finally, to the extent that any other declaration contains hearsay or other testimony that would not be admissible at trial, the Court has considered these factors in determining the weight to be given to that testimony at this stage of the proceedings.

Although it denies Defendants' Motion to Strike the aforementioned declarations, certain other declarations are due to be stricken for failure to comply with the Local Rules for the Middle District of Florida.  Local Rule 4.06(b)(2) dictates that "[s]ervice of all papers and affidavits upon which the moving party intends to rely must be made at least five (5) full days prior to the [preliminary injunction] hearing."  See also Fed. R. Civ. P. 6(d) ("[w]hen a motion is supported by affidavit, the affidavit

shall be served with the motion . . ."); <u>Marshall Durbin Farms v. Nat'l Farmers Org.</u>, 446 F.2d 353, 358 (5th Cir. 1971)(applying Rule 6(d) to motions for preliminary injunctions and noting that the rule "requires not only five days notice to the non-moving party of a hearing on the motion, but also that, when a motion is supported by affidavit, the affidavit must be served with the motion . . ."). Rule 4.06(b)(2) was designed to prevent the party moving for preliminary injunction from subjecting the non-moving party to a constant barrage of affidavits and other papers, making it nearly impossible for the non-moving part to meaningfully respond and defend. Here, Plaintiff's tactic of "supplementing the record on a continual basis by filing new matter each and every day" "eliminate[d] any opportunity that the defendants might have to fairly respond to the allegations and arguments in the plaintiff's Motion for Preliminary Injunction. As these new items . . . [were] added to the record, they constitute[d] additional material to which the defendants need[ed] to respond." (Doc. # 46, p. 10.)

When considering which of Plaintiff's declarations fails to comply with Local Rule 4.06, the Court looks to Federal Rule 6(a), which states that "[w]hen the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." In this case, a review of the docket sheet reflects that the preliminary injunction hearing was held on April 6, 2006. According to the Local Rules,

the cut-off date for service of all papers and affidavits upon which Plaintiff intended to rely was March 29, 2006, or five full days prior to the hearing.  Thus, the following shall be stricken for failure to comply with the Local Rules:  Declaration of Michelle Reith (Doc. # 59), filed on March 30, 3006;  Declaration of Carl Healey (Doc. # 66), filed on April 11, 2006;  Declaration of Brenda Crain– Second Supplemental (Doc. # 69), filed on April 12, 2006;  Declaration of Cathy Christopher– Second Supplemental (Doc. # 70), filed on April 12, 2006;  Declaration of Jefferson Taylor (Doc. # 73), filed on April 12, 2006; Declaration of Philip McCabe– First Supplemental (Doc. # 74), filed on April 14, 2006; Declaration of Mariel King (Doc. # 78), filed on April 25, 2006; Declaration of Jonathan Mummert– Third Supplemental (Doc. # 79), filed on May 2, 2006; Declaration of Robert Bentley (Doc. # 80), filed on May 3, 2006; Declaration of Nivea Almodovar (Doc. # 81), filed on May 5, 2006; and Declaration of Nivea Almodovar– First Supplemental (Doc. # 84), filed on May 8, 2006.[1]

---

[1] Because Defendant obtained the Court's permission to submit proof of its radio advertising after the hearing, the Declaration of Trista Youngquist (Doc. # 75) is not stricken, despite the fact that it would have otherwise been in violation of Local Rule 4.06(b)(3).

Similarly, the parties' memoranda of law filed in response to the Court's request for briefing on the anti-dissection rule (Docs. # 67 & 68) are, of course, not stricken because they were filed at the Court's request.  Also, the Court agreed to accept the filing of Docs. # 71 & 72, subject to a later ruling on their admissibility and relevance, and it now admits those documents.

## III.  PRELIMINARY INJUNCTION

The Court now turns its attention to Plaintiff's Motion for Entry of Preliminary Injunction.  Plaintiff has requested that this Court issue a preliminary injunction "to prevent irreparable harm to its longstanding valuable rights, and goodwill, in the INN ON FIFTH name and mark, and to protect the public from continued confusion, deception, and mistake, pending the final outcome of this litigation."  (Doc. # 12, p. 5.)  Traditionally, Courts are hesitant to issue preliminary injunctions in all but the clearest cases.  As the Fifth Circuit noted in United States v. Board of Education of Greene County, Mississippi, 332 F.2d 40, 45-46 (5th Cir. 1964), "[t]here is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction."  The Eleventh Circuit has also emphasized that "[b]ecause a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000)(citing United States v. Lambert, 695 F.2d 536, 539 (11th Cir. 1983))(quoting Texas v. Seatrain Int'l, S.A., 518 F.2d 175, 179 (5th Cir. 1975))).

In evaluating whether an injunction should issue, Courts look to four factors, all of which Plaintiff argues that it has met. The four prerequisites for the issuance of a preliminary injunction are

(1) substantial likelihood of success on the merits; (2) substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to plaintiff outweighs the harm an injunction may cause defendant; and (4) that granting the injunction would not disserve the public interest. <u>Church v. City of Huntsville</u>, 30 F.3d 1332, 1341-42 (11th Cir. 1994).  As the movant, Plaintiff carries the burden of persuading the Court to issue a preliminary injunction. <u>See</u> <u>Siegel</u>, 234 F.3d at 1176.  For the reasons discussed herein, the Court concludes that Gulf Coast has not demonstrated a substantial likelihood of success on the merits; for that reason, it is immaterial whether Gulf Coast has met the other three prerequisites and the motion is due to be denied.

**A.  Substantial Likelihood of Success on the Merits**

In considering whether to issue a preliminary injunction, the trial court must first examine whether the movant has proven a substantial likelihood of success on the merits.  To establish a claim of trademark infringement, the Plaintiff must show that (1) it owns a valid, protectable trademark and (2) there is a likelihood of confusion caused by Gordon River's use of its mark. <u>See</u> <u>Dieter v. B & H Indus. of Southwest Florida</u>, 880 F.2d 332, 326 (11th Cir. 1989).

In this case, where Gulf Coast's trademark application has been approved but the mark has yet to mature into a registered

trademark, the Inn on Fifth mark is not entitled to a presumption of validity.

### 1.  Valid, Protectable Trademark

### a.  Distinctiveness of the Mark

Gordon River argues that the Inn on Fifth mark is not distinctive. "The distinctiveness of the mark at issue refers to how easily customers identify the petitioner's mark with the represented service." Coach House Rest., Inc. v. Coach and Six Rests., Inc., 934 F.2d 1551, 1559 (11th Cir. 1991).  When determining whether a mark is distinctive, courts first must classify the mark as either (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful.  Investacorp, Inc. v. Arabian Inv. Banking Corp., 931 F.2d 1519, 1522 (11th Cir. 1991). Determining which category a given mark belongs in is a question of fact.  Investacorp, 931 F.2d at 1523.

An arbitrary or fanciful term is inherently distinctive, and thus requires no proof of secondary meaning, because the term "bears no relationship to the service." Id. (citing Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc., 810 F.2d 1546, 1549 (11th Cir. 1987)); see also id. (using "Barnbarnfish" to exemplify an arbitrary or fanciful service mark for a hypothetical milk delivery service).  There is no claim in this case that the Inn on Fifth mark is arbitrary or fanciful.

A suggestive mark is one that "suggests the characteristics of the service 'and requires an effort of the imagination by the consumer in order to be understood as descriptive of the service.'" Investacorp, Inc., 931 F.2d at 1523 (using "Barn-Barn" to exemplify a suggestive service mark for a hypothetical milk delivery service). There is no need to prove secondary meaning in order to establish that a suggestive mark is protectable because a suggestive service mark is inherently distinctive. Id.

One test that courts have utilized in determining whether a mark is descriptive or suggestive is "whether competitors would be likely to need the terms used in the trademark in describing their products." See Vision Center v. Opticks, Inc., 596 F.2d 111, 116 (5th Cir. 1979). Without question, the word "inn" is indispensable to the lodging industry's vocabulary. Similarly, as is noted infra, the words "on Fifth" are widely used by a variety of commercial enterprises. As the Fifth Circuit noted in Vision Center, even though "common, ordinary words can be combined in a novel or unique way and thereby achieve a degree of protection denied to the words when used separately," in this case, just as in Vision Center, the Court is not convinced that the words in the Inn on Fifth mark have "the quality of inventiveness and imaginativeness characteristic of suggestive trade names." Vision Center, 596 F.2d at 116-17.

It is even more compelling to note that where "the customer who observes the term can readily perceive the nature of plaintiff's services, without having to exercise his imagination, the term cannot be considered a suggestive term." Investacorp, Inc., 931 F.2d at 1524.  A customer who sees the Inn on Fifth mark could readily discern that Gulf Coast's product was an inn on Fifth Avenue; consequently, the Court rejects Gulf Coast's argument that the mark is suggestive.

Having determined that the Inn on Fifth mark is neither suggestive nor arbitrary or fanciful, the question becomes whether the mark is descriptive or generic.  If the mark is generic, then it is not protectable under trademark law and the inquiry ends.  If it is descriptive, it will be protectable only if Gulf Coast can prove that it has acquired secondary meaning.

A generic mark suggests the basic nature of the service but is silent as to its source.  See Leigh v. Warner Bros., 212 F.3d 1210, 1216 (11th Cir. 2000); Investacorp, Inc., 931 F.2d at 1522 (using the term "Milk Delivery" to exemplify a generic service mark for a hypothetical milk delivery service).  Courts have generally held that an establishment's mark is generic if "it has become a common, recognized name of such establishments." Vision Center, 596 F.2d at 116.  "A generic term is typically incapable of achieving service mark protection because it has no distinctiveness." Investacorp, Inc., 931 F.2d at 1522.  Because a generic term is

incapable of achieving service mark protection, no analysis of secondary meaning is necessary. "[T]he distinction between descriptive and generic terms is necessarily one of degree." Vision Center, 596 F.2d at 115.

Gordon River argues that the Inn on Fifth mark should be classified as generic. Indeed, in some respects the term seems very generic, particularly because it simply says exactly what the establishment is— an inn on Fifth Avenue. If the mark is generic, then it receives no trademark protection and the inquiry would end here; however, the Court is not convinced that the Inn on Fifth mark is merely generic.

Even though the Inn on Fifth mark has some generic properties, courts have held that other marks with similar formulations are not generic. The most persuasive example was discussed by the Fifth Circuit in Bank of Texas, 741 F.2d at 786. In Bank of Texas, the court held that the Bank of Texas mark was descriptive rather than generic because it described the type of services offered and the place from which those services originate. The Bank of Texas court held that the Bank of Texas mark was not inherently distinctive, but went on to analyze the mark's secondary meaning. The fact that the court analyzed the mark's secondary meaning clearly indicates that it found that the mark was not generic. After all, regardless of secondary meaning, if a mark is generic, then it is incapable of protection and is not distinctive. The analysis employed in the

<u>Bank of Texas</u> decision, as well as the formulaic similarity between the Bank of Texas and the Inn on Fifth marks further persuades the Court that the Inn on Fifth mark is not generic.

In contrast to a generic mark, a descriptive mark is one that merely identifies a characteristic or quality of a service and does not, on its own, give consumers any idea about the source of the service. See <u>Investacorp</u>, 931 F.2d at 1522 (using "BarnMilk" to exemplify a descriptive mark for a hypothetical milk delivery service). A descriptive mark is not inherently distinctive but can, in some cases, acquire distinctiveness if it has developed secondary meaning.

Geographically descriptive marks, which "can indicate any geographic location on earth, such as continents, nations, regions, states, cities, streets and addresses, areas of cities, rivers, and any other location referred to by a recognized name," are a subset of descriptive marks and are treated like other descriptive marks. See <u>Great S. Bank v. First S. Bank</u>, 625 So. 2d 463, 468 (Fla. 1993)(quoting 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 14.01, 14.02, 14.02[1], 14.03 (3d ed. 1992)); <u>see</u> <u>also</u> <u>id.</u> (noting that to determine if a mark is geographically descriptive, one should ask whether "the mark [is] the name of the place or region from which the goods actually come[.] If the answer is yes, then the geographic term is probably used in a descriptive sense, and secondary meaning is required for

-14-

protection."). "A geographically descriptive mark is generally considered not  inherently distinctive, but weak, and given a narrow range of protection." <u>HBP</u>, 290 F. Supp. 2d at 1328.

Logic compels the conclusion that the Inn on Fifth mark is either descriptive or geographically descriptive. Upon observation of the mark, the public would logically conclude that the mark indicated the type of services offered and the place from which those services originate. In <u>Vision Center</u>, the court stated that "[t]he dictionary definition of the word is an appropriate and relevant indication 'of the ordinary significance and meaning of words' to the public." <u>Vision Center</u>, 596 F.2d at 116 (quoting <u>Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.</u>, 494 F.2d 3, 11 (5th Cir. 1974)). Webster's Dictionary defines an inn as a "dwelling or lodging" or "an establishment or building providing food, drink, bedrooms, etc. for travelers." Webster's New Collegiate Dictionary, 726 (1970). Of course, the term "on Fifth" is commonly used to indicate that a certain thing or place is located on Fifth Avenue. Just as in <u>Bank of Texas</u>, the name describes both the type of services offered as well as the place where those services originate. Moreover, like the mark in <u>Investacorp</u>, "it is beyond doubt that the term . . . bears a relationship to the type of services being offered by plaintiff." <u>Investacorp, Inc.</u>, 931 F.2d 1523. For these reasons, the Court

finds that the Inn on Fifth mark is a descriptive or geographically descriptive mark.

The analysis of the Inn on Fifth mark's distinctiveness does not end here.  All descriptive or geographically descriptive marks are not created equal.  In a given group of descriptive marks, there is a spectrum: on one end, there are "strong" descriptive marks and at the other end there are "weak" descriptive marks.  "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties."  John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 973 (11th Cir. 1983)(citing Exxon Corp. v. Texas Motor Exch., Inc., 628 F.2d 500, 504 (5th Cir. 1980)).  By and large, the more distinctive the mark, the stronger it is.  "The strength and distinctiveness of plaintiff's mark is a vital consideration in determining the scope of protection it should be accorded.  'Strong marks are widely protected, as contrasted to weak marks.'"  Id. (citing Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d at 259 (quoting Lunsford, Trademark Basics, 59 Trade-Mark Re. 873, 878 (1969))).

As the court noted in John H. Harland Co., one of the factors in evaluating the strength of the mark is how often it is used by third parties.  In HBP, Inc., 290 F. Supp. 2d at 1329, the district court explained that "[t]he less that third parties use the mark, the stronger it is, and the more protection it deserves. . . .

-16-

Extensive third party use of the mark or a term used in the trademark weakens the strength of the mark." Id. (quoting Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999); John H. Harland Co., 711 F.2d at 974; and Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n, 651 F.2d 252, 260 (5th Cir. 1981)).

In Investacorp, the Eleventh Circuit analyzed the strength of the plaintiff's mark in terms of third party use.  The court's analysis focused on the mark's formative components, which were "invest" and "corp," and concluded that the extremely wide third-party use of both terms significantly weakened the mark. Encouraging the same type of analysis, Gordon River notes that the formative components of the Inn on Fifth mark are "inn" and "fifth" or "on fifth," both of which are used commonly by third parties. As an example of this broad use, Gordon River notes that a Google.com search for web pages containing the phrase "inn on" in their titles yields about 213,000 results.  A similar search for "inn on" anywhere in the document results in about 5,680,00 hits. As further proof of third party use, Gordon River states that

> [a]long the twelve-block stretch of Naples'[s] Fifth
> Avenue called 'Fifth Avenue South,' there are no fewer
> than eight businesses, including the plaintiff's and the
> defendants', using the word 'Fifth' in their names, also
> in a geographical sense.  At least four of those have
> chosen a name with the same structure as plaintiff's, the
> generic name of the good or service provided followed by
> the appellation 'on fifth' (e.g., Accessories on Fifth,
> Salon on Fifth). . . .

(Doc. # 45, p. 6.)

Gordon River further argues that the Inn on Fifth mark has been weakened by third-party use because the exact words of the mark have previously been used to describe a lodging establishment, Cavanaugh's Inn on Fifth Avenue in Seattle, which opened the year before Gulf Coast began using the Inn on Fifth mark.  According to Gordon River, this prior use of the Inn on Fifth mark makes the mark even less distinctive.  Gordon River also points out that Fifth Avenue in Naples is not the most famous Fifth Avenue in the world, and that "[a]ny attempt to build an inherently distinctive mark on such a pedestrian construction is futile." (Doc. # 45, p. 7).

As the Eleventh Circuit stated in <u>Investacorp</u>, when a mark contains very common formative components, "[t]he likelihood of prospective use by competitors is high" and "it is very likely that competitors will need to use these terms." <u>Investacorp</u>, 931 F.2d at 1523; <u>see</u> <u>also</u> <u>Bank of Texas</u>, 741 F.2d at 787 (Bank of Texas mark not inherently distinctive because it merely combines the generic word "bank" with the geographical term "Texas").  The Court concludes that the Inn on Fifth mark, which contains very common formative components that have been used widely by third parties, is relatively weak in its descriptiveness.  Based on this conclusion, the Court next examines whether the Inn on Fifth mark has acquired secondary meaning.

**b.  Secondary Meaning**

As a descriptive or geographically descriptive mark, the Inn on Fifth mark must have acquired secondary meaning in order to be valid and protectable.  Courts see secondary meaning "as a means by which otherwise unprotectable marks may obtain protection." Univ. of Ga. Athletic Ass'n. v. Laite, 756 F.2d 1535, 1540 (11th Cir. 1985).  "Secondary meaning is the connection in the consumer's mind between the mark and the provider of the service."  Coach House Rest., Inc., 934 F.2d at 1559 (also noting that the existence of a secondary meaning is a question of fact).  In Bank of Texas, the court recognized that "a plaintiff must show that the primary significance of the term in the mind of the consuming public is not the product but the producer." Bank of Texas, 741 F.2d at 787.

Regarding the secondary meaning of geographic terms, one court noted that the plaintiff needs to demonstrate that:

> a sufficient segment of a relevant market group comes to associate the phrase not just with the geographic place it originally signified, but also with a single source of goods or services available in the marketplace.  Words that describe the geographic origin of goods, or the geographic location where services are provided, are not *inherently* distinctive.

See HBP, Inc., 290 F. Supp. 2d at 1328 (quoting Pebble Beach Co. v. Laub Am. Corp., 1985 U.S. Dist. LEXIS 23876, 1985 WL 5584, *7 (N.D. Cal. Dec. 27, 1985)).  Secondary meaning must be established before the date that the other party began using the similar term. Investacorp, Inc., 931 F.2d at 1524.

Gulf Coast has not carried its burden of proof on the issue of secondary meaning.  In this case, that failure necessitates denial of the motion for preliminary injunction.  To begin, Gulf Coast faced two significant obstacles.  First, as the Court noted <u>supra</u>, "[b]ecause a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000)(citing <u>United States v. Lambert</u>, 695 F.2d 536, 539 (11th Cir. 1983)(quoting <u>Texas v. Seatrain Int'l, S.A.</u>, 518 F.2d 175, 179 (5th Cir. 1975))).  Given the extraordinary nature of the remedy, the courts require a movant to carry its overall burden clearly.  Of course, that means that the movant must convince the Court, not that it <u>might</u> succeed, or could <u>possibly</u> succeed; rather, the movant must <u>clearly</u> convince the Court that they are <u>substantially</u> likely to succeed.

Gulf Coast also faced a second obstacle:  where the mark in a trademark suit is descriptive or geographically descriptive, "[a] high degree of proof is necessary to establish secondary meaning for a descriptive term." <u>Vision Center</u>, 596 F.2d at 118 (citing 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 77.3 (3d ed. 1969)); <u>See also Bank of Texas</u>, 741 F.2d at 787 (quoting <u>Zatarains, Inc. v. Oak Grove Smokehouse, Inc.</u>, 698 F.2d 786, 794 (5th Cir. 1983); <u>Vision Center</u>, 596 F.2d at 118; <u>American Heritage</u>, 494 F.2d at 12).  As the former Fifth Circuit

noted in Aloe Creme Labs., Inc. v. Milsan, Inc., "[s]hort of a survey, [establishing secondary meaning is] difficult of direct proof." Aloe Creme Laboratories, Inc., 423 F.2d at 849.

There are four factors to be considered when analyzing whether a mark has acquired secondary meaning. Those four factors are (1) the length and manner of the mark's use; (2) the nature and extent of advertising and promotion for the plaintiff's business; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the mark and the plaintiff's business; and (4) the extent to which the public actually identifies the name with the plaintiff's service. Coach House Rest., Inc., 934 F.2d at 1560.

The first factor is the length and manner of the mark's use. Gulf Coast has established that it has used the mark at least as early as January of 1997. (Doc. # 12, p.3.) In Hair v. McGuire, 188 Cal. App. 2d 348, 10 Cal. Rptr. 414 (1961), three years of continuous use of a mark was sufficient to uphold a finding of secondary meaning; however, in Bank of Texas, 741 F.2d at 788, nine years of exclusive use was insufficient where the court noted that "[o]ther evidence must be considered to determine if a secondary meaning was acquired during a particular time span." Similarly, where plaintiff had used a mark for five years in Investacorp, Inc., because "there [was] nothing significant about the manner of appellant's use of the mark, other than appellant merely 'displayed

its service mark on nearly all of its transactional documents,'" the court did not find that the mark had developed secondary meaning.  Thus, although the period of time Gulf Cast has used the mark is lengthy, it is not enough, standing alone, to establish secondary meaning.

The second factor is the nature and extent of advertising and promotion for the plaintiff's business.  Gulf Coast has shown that it has expended large sums of money to advertise and promote the Inn on Fifth in various forms of commerce under the "Inn on Fifth" mark. (Doc. # 12, p. 3.) However, "it is not the amount of money spent on advertising that is important, but the results achieved with the money spent." Bank of Texas, 741 F.2d at 788 (citing Aloe Creme Labs., Inc., 423 F.2d at 850, cert. denied, 398 U.S. 928, 90 S. Ct. 1818, 26 L. Ed. 2d 90, 165 U.S.P.Q. (BNA) 609 (1970)); see also Aloe Creme Labs., 423 F.2d at 850 ("it must be remembered that the question is not the *extent* of the promotional efforts, but their *effectiveness* in altering the meaning [of the mark] to the consuming public.").  In other words, even proof of a substantial advertising campaign and/or budget is not enough where it does not result in the public's identification of the mark with plaintiff's products or services.

The third factor is the efforts made by the plaintiff to promote a conscious connection in the public's mind between the mark and the plaintiff's business.  Here, Gulf Coast has not

produced clear evidence that it has promoted a conscious connection in the public's mind between the mark and the inn.  Conagra, Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir. 1984), provides an example of a company that made efforts to promote a conscious connection between a mark and a product.  In Conagra, the court looked at the fact that Conagra introduced a promotional film, which emphasized the extensive efforts at quality control that Singleton made and tied the Singleton name to the group of seafood products that it marketed.  Id.  The film was "widely displayed to brokers and retailers in the seafood business for over three years preceding the instant litigation."  Id.

The very fact that courts have analyzed this element separately from the mere expenditure of money and effort to advertise indicates that courts look for something more than proof that a plaintiff has extensively advertised its goods or services to the public.  As is mentioned supra, there is evidence that Gulf Coast has advertised extensively.  However, there has been little proof, if any, provided to show that that advertising was geared towards promoting a conscious connection.  As the transcript reflects, the Court specifically and repeatedly provided Gulf Coast with the opportunity to persuade the Court on this point at the hearing; however, counsel was either unable or unwilling to address this element, and provided no convincing support for the contention that Gulf Coast took any steps similar to the steps taken in

Conagra to promote a conscious connection between the mark and the inn's services.  Gulf Coast merely repeated that a substantial amount of money had been spent, and that the company advertises widely.

Gulf Coast put forward the Declaration of Philip McCabe (Doc. # 14), which arguably could support a claim that the company made specific efforts to promote a conscious connection.  He states that "[m]arketing material was and is utilized to educate the consuming public as to the adoption of the mark INN ON FIFTH by Applicant" and Gulf Coast held several opening events, during which the company handed out marketing materials displaying the Inn on Fifth mark.  (Doc. # 14, p. 2, ¶ 4.)  McCabe also explains that Gulf Coast's efforts to promote a conscious connection include "participat[ing] in numerous trade shows" (Doc. # 14, p. 5, ¶ 19.); being "involved in many community and charity activities in which its mark INN ON FIFTH is prominently seen by customers and potential customers" (Doc. # 14, p. 5, ¶ 21.)  These statements support the argument that Gulf Coast advertised extensively but not the argument that the advertising was geared towards promoting a conscious connection between the mark and the inn.

The fourth factor is the extent to which the public actually identifies the name with the plaintiff's service.  On this factor in particular, Gulf Coast has not met its heavy burden of proof. Here, courts look to whether there is evidence that the plaintiff

has achieved the recognition for its name that it has sought.  See Conagra, Inc., 743 F.2d at 1513.  Actual identification is best proved by surveys or other quantifiable proof, and, absent such data, it is very difficult to prove.

Case law documents the difficulty of proving actual identification.  For example, the Fifth Circuit found no actual identification even where a company could produce eight witnesses who testified as to customer attitudes towards the company's product; expended almost three million dollars in advertising and marketing in national publications; took out newspaper ads; set up displays and promotions within their stores; and where "the value and quality of appellant's products and the success of its business [had] been recognized by independent writers in newspaper and magazine articles exhibited to the district court [, which] designated the Florida-based corporation as the single source of 'Alo' cosmetics."  Aloe Creme Labs., 423 F.2d at 850.

In Vision Center, 596 F.2d at 119, seven of the plaintiff's customers testified that the name "Vision Center" meant the partnership's business to them, as well as testimony that the partnership had occasionally received mail addressed to other establishments containing the word "vision" in their name, and that a customer of one of defendant's stores in another city believed that plaintiff and defendant's businesses were related.  Id. at 119.  The court ultimately concluded that this evidence, even when

combined with evidence that plaintiff had used the term for over 20 years in the relevant area, was insufficient to establish secondary meaning. Id. In finding no actual identification or secondary meaning, the Court noted that the plaintiff had provided no survey evidence of the public's perception of its name. Id.

In American Television & Communications Corp. v. American Communications , 810 F.2d 1546, 1549 (11th Cir. 1987), the Eleventh Circuit affirmed the trial court's determination that the plaintiff had failed to prove secondary meaning, emphasizing that no surveys or quantitative evidence were proffered and that the plaintiff's evidence of its advertising, press releases, coverage in the media, annual reports, and two misdirected missives were not enough to convince the appellate court that the trial court's ruling was clearly erroneous. Id. at 1549-50.

Although the case law repeatedly demonstrates the preferability of surveys or other quantifiable evidence of actual identification, Gulf Coast did not put forth any survey evidence. Rather, it chose instead to primarily rely on Google.com searches and the testimony of Gulf Coast's president and employees of the Inn on Fifth to prove that the public associates the company's services with its mark.

For example, Gulf Coast argues that the results of a Google.com search show that the public identifies the INN ON FIFTH mark with the Plaintiff's services. (Doc. # 12, p. 14.) For a

variety of reasons, the Court has a healthy skepticism of this argument; after all, Gulf Coast failed to establish how the results of a Google.com search would prove that the public associates the inn's services with the Inn on Fifth mark.

In addition to the Google.com search results, Gulf Coast proffers the testimony of Philip McCabe, President of Gulf Coast Commercial Corporation. McCabe states that when the company launched its "extensive marketing campaign," there was "immediate and widespread brand recognition." (Doc. # 14, p. 2, ¶ 4.) McCabe makes other similarly self-serving and conclusory statements throughout his declaration, which relate to the reasons why consumers frequent the Inn on Fifth's website (Doc. # 14, p. 5, ¶ 18), the beauty of the Inn on Fifth signage (Doc. # 14, p. 5, ¶ 20), the reasons why the inn has guests return to stay with the hotel multiple times (Doc. # 14, p. 7, ¶ 25), and that

> [e]xtensive advertising and marketing efforts have caused customers and potential customers to identify Gulf Coast Commercial Corporation as the source of exceptional hotel and hospitality services offered under the mark INN ON FIFTH. As such, distinctiveness of the Gulf Coast Commercial Corporation's relation to the goods and services has, in fact, been established in the minds of the consuming public.

(Doc. # 14, p. 7, ¶ 29.) Although McCabe may be in a position to testify about the company's advertising efforts, his opinion that those actions have resulted in the public's actual identification are apparently grounded in nothing but conjecture. Such conclusory

opinions are insufficient to persuade the Court that the public actually identifies the mark with the inn.

Among the many other declarations that Gulf Coast filed, some could arguably go to the issue of actual identification. However, even when considered together in their best possible light, those declarations are simply not enough to convince the Court that the public actually identifies the mark with the inn. This is particularly true in light of the fact that several of Gulf Coast's declarations seem to contradict its claims of actual identification and secondary meaning. In order to show secondary meaning, Gulf Coast must prove that a sufficient segment of a relevant market group has come to associate the Inn on Fifth mark with a single source of goods or services available in the marketplace, or, in this case, The Inn on Fifth. To the contrary, Gulf Coast submitted a number of declarations that indicate that some customers identify the Bayfront Inn on Fifth with the Inn on Fifth mark. For example, the Declaration of Sharon Safko (Doc. # 15) details several encounters with individuals who mistakenly contacted the Inn on Fifth when they wished to stay at the Bayfront Inn.

The Declarations of Robert Bentley (Doc. # 18) and Damon Delp (Doc. # 19) also indicate that the relevant market group may actually associate the Inn on Fifth mark with the Bayfront Inn. Delp recalls a phone call from a woman who asked if the Inn on Fifth was the Bayfront Inn and if the Inn on Fifth was a former

-28-

Comfort Inn.  When the Inn on Fifth's employee answered in the negative and told her the services that the Inn on Fifth had to offer, the woman interrupted her and asked if the Inn on Fifth was on the water.  When the Inn on Fifth employee answered in the negative, the woman thanked her for her time and said she wanted to stay on the water.  Bentley recounts an incident where a workman was looking for the Bayfront Inn and ended up at the Inn on Fifth by mistake.  Other declarations contain similar occurrences where individuals apparently seeking the Bayfront Inn's services contacted the Inn on Fifth by mistake.  <u>See, e.g.</u>, First Supplemental Declaration of Robert Bentley (Doc. # 28); First Supplemental Declaration of Sharon Safko (Doc. # 29); Second Supplemental Declaration of Damon Delp (Doc. # 33); Declaration of Mariel King (Doc. # 43).

On balance, the Court concludes that Gulf Coast's burden of proof was high, and it simply did not present evidence sufficient to overcome it.  Because Gulf Coast was unable to produce sufficient support on the issue of actual identification, the Court is compelled to find that Gulf Coast has failed to carry its burden of persuasion on secondary meaning.  Without secondary meaning, Gulf Coast's descriptive or geographically descriptive mark is not protectable.  Of course, the existence or absence of likelihood of confusion becomes irrelevant to the Court's inquiry since Gulf Coast has not shown that the mark is valid and protectable.  <u>See</u>

Am. Television & Comms. Corp., 810 F.2d at 1548 ("Only if plaintiff has proven [that it has a protectable mark] need we reach the issue of whether it has also proved the likelihood of confusion between the two names...."); Rock & Roll Hall of Fame & Museum v. Gentile Prods., 71 F. Supp. 2d 755 (N.D. Ohio 1999)("a court does not reach the issue of confusion until it finds a valid protectable mark.").

Since Gulf Coast has not shown that the Inn on Fifth is a valid, protectable trademark, it has not carried its burden of persuading the Court that it has a likelihood of success on the merits. Without proof that Gulf Coast has a likelihood of success on the merits, the Court declines to grant injunctive relief.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

Defendants' Motion to Strike Declarations (Doc. # 46) is **GRANTED IN PART, DENIED IN PART.** The following declarations shall be stricken for failure to comply with the Local Rules: Declaration of Michelle Reith (Doc. # 59); Declaration of Carl Healey (Doc. # 66); Declaration of Brenda Crain- Second Supplemental (Doc. # 69); Declaration of Cathy Christopher- Second Supplemental (Doc. # 70); Declaration of Jefferson Taylor (Doc. # 73); Declaration of Philip McCabe- First Supplemental (Doc. # 74); Declaration of Mariel King (Doc. # 78); Declaration of Jonathan Mummert- Third Supplemental (Doc. # 79); Declaration of Robert

Bentley (Doc. # 80); Declaration of Nivea Almodovar (Doc. # 81); and Declaration of Nivea Almodovar- First Supplemental (Doc. # 84).

Plaintiff Gulf Coast Commercial Corporation's Motion for Entry of Preliminary Injunction (Doc. # 11) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Fort Myers, Florida, this <u>18th</u> day of May, 2006.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record